Filed 7/16/26  P. v. Vallejo CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AARON VALLEJO et al.,<br><br>    Defendants and Appellants. | H050184<br>(Santa Clara County<br> Super. Ct. No. C1808374) |

Aaron Vallejo and Joseph Esquivel participated in an attack on security guards at a bar, which resulted in a fatal stabbing.  They were indicted for first degree murder, three counts of assault with a deadly weapon, attempted robbery, and participating in a criminal street gang.  In addition, with respect to all but the gang participation charge, the indictment alleged sentencing enhancements for acting for the benefit of a criminal street gang.

The jury rendered a mixed verdict.  It acquitted Vallejo and Esquivel of first degree murder and one of the assault charges.  It also found the gang sentencing enhancement allegations untrue, and it failed to reach unanimous verdicts on another assault charge as well as the attempted robbery and gang participation charges.  However, the jury convicted both Vallejo and Esquivel of second degree murder, one count of

assault with a deadly weapon, and one count of simple assault, and it found that Vallejo used a knife in connection with the murder and the latter assault.

On appeal, Vallejo challenges the sufficiency of the evidence of murder and assault with a deadly weapon. In addition, both Vallejo and Esquivel contend that the trial court improperly allowed the gang participation charge and the gang sentencing enhancements to be tried with the murder, assault, and attempted robbery charges and that the unified trial led to the admission of cumulative gang-related evidence in violation of Evidence Code section 352. They also argue that the large volume of gang evidence at trial violated the California Racial Justice Act of 2020 (RJA) (Stats. 2020, ch. 317, § 1). Vallejo and Esquivel contend as well that the jury instruction on implied malice murder was erroneous. And they argue that cumulative prejudice from these alleged errors warrants reversal.

As explained below, we conclude that there was sufficient evidence to support Vallejo's convictions for murder and assault with a deadly weapon, but insufficient evidence to support the sentencing enhancement for personal use of a knife. We hold that any error in trying the substantive charges with the gang participation charge and gang enhancements as well as in admitting gang-related evidence was harmless. Finally, we reject defendants' RJA, jury instruction, and cumulative error arguments. Accordingly, we affirm the judgment.

## I. BACKGROUND

### A. The Offenses

On February 25, 2017, Vallejo held a birthday party for his daughter. Esquivel and his brother Santos Trevino, who were friends of Vallejo, attended the party along with their sister Percella, Robert Ruiz, and, possibly, Andrew Cervantes.

After the party, Esquivel borrowed his brother Trevino's identification card so that he could go to a bar. Although Esquivel was 27 years old, he had facial tattoos, and some

bars refuse admission to individuals with tattoos on their neck or above (apparently because such individuals "tend to cause problems").  Before going to these bars, Esquivel would cover up his facial tattoos.  However, Esquivel's own identification card apparently showed his tattoos, and he needed one without tattoos.

With his tattoos covered, Esquivel went to a bar in San José with his sister Percella and two other women.  When Esquivel reached the security kiosk in front of the bar, he presented his brother's identification card.  Recognizing the card was not Esquivel's, the security guard manning the kiosk, Juan Solis, informed Esquivel that bar policy required him to keep the card and hand it over to the police.  Esquivel demanded the card back, became abusive and aggressive, and threatened to "call his boys . . . to come get his ID back."

Esquivel then called his brother.  Ten minutes later, Trevino arrived in a car accompanied by Vallejo, Cervantes, and Ruiz.  After the others exited and approached the bar, Ruiz turned the car around so that it was facing the street.  Esquivel and Cervantes greeted Trevino and Percella, and the four approached the security kiosk.

Trevino demanded that Solis return his identification card and reached for it in Solis' pocket.  Solis flinched and told Esquivel not to touch him.  In response, Esquivel punched Solis in the head.  Solis radioed Frank Navarro, the security manager, who approached and tried to explain the bar's policy on identification cards to Trevino, Esquivel, and Cervantes.  Esquivel and Cervantes responded by punching Navarro.  Trevino also took out a switchblade and stabbed Navarro.  Clutching his neck, Navarro said that he had been stabbed, walked towards the door to the club, and, shortly thereafter, collapsed.  After a security guard hit Esquivel in the head with a stanchion and Cervantes threw another stanchion at a security guard, Esquivel, Trevino, and Cervantes departed.

When the encounter with the security guards began, Vallejo was pacing behind the crowd gathered before the security kiosk. When Esquivel, Trevino, and Cervantes engaged Navarro, Vallejo jumped up and raced around the crowd to Navarro's left flank where, out of sight of the video, he remained briefly. Then, Vallejo withdrew in a sideways trot, with his hands in front of him, possibly folding something, before entering Ruiz's car.

Navarro died soon after collapsing: A wound to his neck had severed his jugular vein and carotid artery, causing rapid and fatal blood loss.

Vallejo, Trevino, and Ruiz left the bar in the car that Ruiz was driving, while Esquivel and Cervantes fled on foot. Not long afterwards, a police officer stopped Ruiz's car, and after attempting to run away, Vallejo was apprehended. No knife was found on Vallejo, in the car, or in the vicinity, and although Vallejo had blood on his hands, it was not Navarro's.

**B. The Charges**

On December 19, 2018, a grand jury indicted Vallejo and Esquivel along with Trevino, his sister Percella, Cervantes, and Ruiz. All six were charged with first degree murder for the death of Navarro. (Pen. Code, § 187, subd. (a); count 1.) The indictment also charged the defendants with attempted robbery (*id.*, §§ 211, 212.5, subd. (c), 664; count 2) and separate counts of assault with a deadly weapon against Navarro, Solis, and a third security guard, Nathaniel Broderick (*id.*, § 245, subd. (a)(1); counts 3-6). In addition, all the defendants except Percella were charged with participation in a criminal street gang (*id.*, § 186.22, subd. (a); count 6), and Ruiz was charged with reckless driving (Veh. Code, § 2800.2, subd. (a); count 7).

The indictment also alleged sentencing enhancements for acting for the benefit of a criminal street gang in connection with all the charges except the gang participation charge (Pen. Code, § 186.22, subd. (b)) and, against Vallejo and Trevino, for personal use

4

of a knife in connection with charges for the murder and assault of Navarro (*id.*, § 12022, subd. (b)(1)).

## C. The Proceedings Below

### 1. *The Trial*

In 2021, Vallejo, Esquivel, Trevino, and Cervantes went to trial, which lasted 16 days.

#### a. The Murder, Robbery and Assault Charges

Much of the encounter at the bar was captured on video from cameras at the bar, two neighboring establishments, and a Valley Transportation Authority (VTA) light rail station. The videos show Vallejo, Trevino, and Cervantes arriving in a car driven by Ruiz. They show Trevino and Cervantes meeting with Esquivel and Percella, and the four approaching the kiosk in front of the bar. The videos also show Esquivel, Trevino, Cervantes, and Percella confronting and then punching Solis; Navarro intervening and being assaulted; and Navarro clutching his neck before collapsing. Vallejo is also shown circling around the crowd gathered in front of the security kiosk and, when Trevino and the others were assaulting Navarro, racing around the crowd to Navarro's left flank—though this last movement is obscured by the side of the building in one video and by a hanging plant in another. Finally, the videos show Vallejo rapidly sidestepping away from the bar while holding something in his hands in front of him.

There also were several eyewitnesses. Solis, the security guard who confiscated the identification card presented by Esquivel, testified about the assaults on him and on Navarro. Solis said that when he refused to give Trevino the card, Esquivel punched him on the side of the head. Solis also testified that when Navarro approached Esquivel, Trevino, and Cervantes, all three punched Navarro. Finally, although Solis did not see any knives being used, he testified that, after Navarro was stabbed, he saw Trevino holding a pocketknife.

5

Broderick, the other security guard who was assaulted, also testified. Broderick testified that after Solis confiscated the identification card from Esquivel, Esquivel said that he was "going to call his boys" and "they're going to get his ID back." Broderick also testified that he saw Trevino pull something out of his pocket and later strike Navarro in the neck. Then, Broderick testified, "all of a sudden, [Navarro] grabbed his neck" and said that he was stabbed. A woman who was in line to get into the bar likewise saw someone, whom she identified as Esquivel, make stabbing motions towards Navarro before Navarro began bleeding.

In addition, the prosecutor presented testimony from Dr. Joseph O'Hara, the medical examiner who conducted Navarro's autopsy. O'Hara testified that Navarro suffered five stab wounds: one to his neck, two to his left side from below, and two to the right side from above. The neck wound "completely transected" Navarro's left jugular vein and carotid artery, causing roughly a quarter of his blood volume to fill his chest cavity, a wound that quickly became "unsurvivable" and caused Navarro's death.

Finally, a criminalist, Kevin Kellogg, testified that he tested blood from a small stain on a seatbelt in Ruiz's car and found it probable that Navarro was a minor contributor.

b.  The Gang Participation Charge and Sentencing Enhancements

Before trial, Vallejo and Esquivel moved to sever the gang participation charge from the murder, assault, and attempted robbery charges and to bifurcate trial of the gang sentencing enhancements. The trial court denied the motions, and, over defendants' objections of cumulativeness, the prosecutor presented considerable gang-related evidence.

Some of this evidence was in the form of expert testimony from Captain Michael Whittington, the supervisor of the District Attorney's Bureau of Investigation. Whittington testified about the history, background, and operation of the Nuestra Familia

prison gang and their affiliated Norteño street gangs. Whittington also testified about the importance of respect in gang culture and how gang members equate respect with fear. He explained that disrespect is met with violence and that gang members are expected to support fellow gang members in retaliating violently against disrespect. Indeed, gang members gain prestige in a gang by responding to disrespect with disproportionate and excessive violence.

Whittington also testified about the paraphernalia and symbols that Norteño gang members use to indicate their allegiance to the gang. For example, Norteño gang members frequently wear clothing and get tattoos with red colors. Norteño gang members also use the number 14—"N" is the fourteenth letter in the alphabet—in Arabic, Roman, or even ancient Aztec or Mayan numerals. Affiliated local gangs also use their initials, sport mascots, or logos associated with the gangs such as sharks for San José area gangs or the UNC logo for the Varrio Norte Catorce gang. Finally, gang members often make hand gestures indicating certain letters to show gang allegiance.

To prove that Vallejo, Esquivel, and the other defendants were gang members, the prosecution presented photographs and Facebook pages showing tattoos, clothing, hand gestures, and other indications of gang allegiance. Indeed, six law enforcement officers testified about gang-related photographs and social media materials concerning defendants in more than a dozen exhibits spanning over 320 pages. In addition, Captain Whittington returned to the stand and explained how these exhibits contained colors, numbers, and other things indicating gang affiliation.

Finally, because the gang participation charge against Vallejo and Esquivel required proof of participation in a group engaged in "a pattern of criminal gang activity" (Pen. Code, § 186.22, subd. (a)), which requires commission of at least two enumerated offenses within three years of the charged offense (*id*., § 186.22, subd. (e)(1)), the prosecution presented evidence that Esquivel and Vallejo had prior convictions for

robbery, Trevino a conviction for illegal firearms possession and methamphetamine possession, Cervantes a conviction for firearm possession, and two other gang members convictions for robbery and firearms possession.

    c.  <u>The Verdict</u>

The jury's verdict was mixed. It acquitted all four defendants of first degree murder and of assaulting Solis with a deadly weapon. It also found the gang sentencing enhancements untrue. In addition, the jury failed to reach unanimous verdicts on attempted robbery, assault with a deadly weapon on Broderick, and the gang participation charge. However, the jury convicted Trevino, Esquivel, and Vallejo (but not Cervantes) of second degree murder, assault with a deadly weapon against Navarro, and simple assault against Solis. In addition, the jury found that Trevino and Vallejo personally used a knife in connection with the murder and assault of Navarro.

    d.  <u>Sentencing</u>

In July 2022, because Vallejo had a prior strike conviction, the trial court sentenced him to 30 years to life for second degree murder consecutive to a one-year enhancement for personal knife use as well as a one-year, concurrent term for simple assault. The court also imposed but stayed a seven-year term for the assault with a deadly weapon conviction and personal knife use enhancement, and it struck a five-year prior serious felony enhancement. In addition, after dismissing Esquivel's prior strike and striking a serious felony enhancement, the trial court sentenced Esquivel to 15 years to life for second degree murder and a one-year concurrent term for simple assault. Finally, the court imposed but stayed a three-year term on the assault conviction.

Vallejo and Esquivel filed timely notices of appeal.

## II. DISCUSSION

Vallejo challenges the sufficiency of the evidence presented against him on the murder and assault charges, as well as the personal knife use enhancement. Both Vallejo

8

and Esquivel challenge the trial court's treatment of the gang participation charge and gang sentencing enhancements, which they contend should have been either severed or bifurcated and therefore violate the RJA. They also challenge the volume of gang-related evidence admitted. Finally, they contend that the trial court improperly instructed the jury on implied malice murder. We address each of these challenges below.

## A. Sufficiency of the Evidence Presented against Vallejo

We begin with the sufficiency of the evidence presented against Vallejo. Vallejo contends that the videos that partially captured the encounter in which Frank Navarro was stabbed and killed exonerate him. For the most part, we disagree.

Based on the videos, there was substantial evidence that Vallejo protected Trevino and the other initial participants in the attack on the bar's security guards by surveilling the crowd for potential threats and waited in reserve to assist, which in fact he briefly did after Trevino attacked Navarro. The videos also show that Vallejo had a brief opportunity to stab Navarro and that he may have had a pocketknife. However, there is no evidence that Vallejo in fact stabbed Navarro, nor any evidence that he menacingly displayed a knife.

Accordingly, we affirm Vallejo's murder and assault convictions because there is substantial evidence of aiding and abetting. However, we vacate the personal knife use enhancements on the convictions because of insufficient evidence.

### 1. *The Substantial Evidence Standard*

In assessing sufficiency of the evidence presented, reviewing courts apply the substantial evidence standard. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Under this standard, courts "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid.*)

The substantial evidence standard " 'is deferential.' " (*People v. Semaan* (2007) 42 Cal.4th 79, 88 (*Semaan*).)  In applying it, appellate courts " ' "resolve neither credibility issues nor evidentiary conflicts . . . ." ' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142; see also *Semaan*, at p. 88 [" 'the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted' "].)  Instead, the question considered is whether " ' "*any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt*." ' " (*People v. Stacy* (2010) 183 Cal.App.4th 1229, 1234.)  Accordingly, " 'the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" (*People v. Perez* (2000) 84 Cal.App.4th 856, 861.)  In particular, appellate courts " 'must accept logical inferences that the jury might have drawn from circumstantial evidence.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  And " '[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment . . . ." (*People v. Mumin* (2023) 15 Cal.5th 176, 202.)  " '[I]t is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the fact upon which a determination depends.' " (*Ibid*.)

Vallejo points out that, in reviewing sufficiency, a court may reject evidence if the evidence "is so improbable as to be incredible, and amounts to no evidence." (*People v. Headlee* (1941) 18 Cal.2d 266, 267.)  Citing several federal decisions and decisions from other states, Vallejo also contends that the courts may reject a jury's apparent findings when unchallenged video footage " 'clearly contradicts' " the inferences asserted by a party and "no reasonable fact finding may reject what the video shows." (Quoting *Scott v. Harris* (2009) 550 U.S. 372, 378-380 (*Scott*); see also *Morton v. Kirkwood* (11th Cir. 2013) 707 F.3d 1276, 1284 (*Morton*); *State v. Russo* (Haw. 2017) 407 P.3d 137, 151,

fn. 17; *Fowler v. Weber* (S.D. 2000) 607 N.W.2d 252, 254.)  However, this principle applies only if a video "blatantly contradict[s]" a party's account (*Scott*, at p. 380) and so "completely and clearly contradicts a party's testimony, that [the] testimony becomes incredible." (*Morton*, at p. 1284.)

### 2. *Aiding and Abetting*

The jury was instructed to consider whether Vallejo murdered Frank Navarro either directly or by aiding and abetting another.  To establish aider and abettor liability, a prosecutor must prove three elements: " '(a) the director perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea— knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 146.)  Vallejo does not dispute that the prosecutor presented sufficient evidence of the first two elements: Trevino's murder of Navarro and Vallejo's knowledge of Trevino's intent as well as his own intent to assist.  However, he contends that the VTA surveillance video showed definitively that he "did not do anything to aid, facilitate, promote, or instigate" Trevino's stabbing and killing of Navarro.  We disagree.  As explained below, the VTA video shows that Vallejo protected Trevino and the others who initially confronted the bar security guards and that, when Trevino attacked Navarro, Vallejo attempted to assist the attack.

The VTA video shows that Vallejo was not idly standing around while Trevino, Esquivel, Cervantes, and Percella confronted the bar security guards.  While Trevino and the others did this, Vallejo circled around the crowd outside the bar.  Facing the kiosk, he walked to one end of the crowd, glanced behind, and then walked back to the other side of the crowd.  Finally, reaching into his right pocket, he returned towards the kiosk, jumped, and ran around the crowd to Navarro's open left flank.  For a few seconds,

11

Vallejo was obscured. However, he then returned and, while still facing the kiosk, sidestepped back to Ruiz's car and got into it.

Based on this video, the jury could have reasonably inferred that Vallejo assisted Trevino, Esquivel, and Cervantes in confronting the bar's security guards. First, the jury could have inferred that, by circling back and forth around the crowd, Vallejo was surveilling the crowd to protect them against an attack from behind. Second, the jury reasonably could have inferred that Vallejo was waiting in reserve so that he could intervene when needed. Indeed, when Trevino attacked Navarro, Vallejo did just that: He ran around the crowd towards Navarro and remained there for several seconds, which would have allowed him to join in or otherwise assist the attack on Navarro. Thus, the videos provided substantial evidence of Vallejo's assistance in Trevino's attack on Navarro.

In asserting that the VTA video precludes any finding that Vallejo aided and abetted Trevino, Vallejo does not consider whether Vallejo was protecting his colleagues or waiting in reserve. Instead, Vallejo points out that the video does not show Vallejo speaking with or encouraging Trevino after they arrived at the bar. Vallejo also notes that Trevino began attacking Navarro before Vallejo arrived near his side and paid no attention when Vallejo did so. Finally, Vallejo points out that nothing in the VTA video suggests that Vallejo's presence had any deterrent effect on onlookers. All this may be true. However, none of it contradicts the conclusion that Vallejo was attempting to assist Trevino by protecting his back and waiting in reserve, and therefore it did not preclude the jury from finding that Vallejo aided and abetted Trevino's attack on Navarro.

Vallejo also argues that his murder conviction cannot be upheld on an aiding-and-abetting theory because the prosecutor did not argue to the jury that Vallejo was guilty of aiding and abetting. We disagree. As noted above, the trial court instructed the jury on aiding and abetting with respect to both the murder and the assault charges. Specifically,

12

the jury was instructed that Vallejo could be held guilty because he was "a direct aider and abettor," or because "he intended to aid and abet one crime, and another crime, which was a natural and probable consequence of the intended crime, was committed at the same time." Moreover, as the Supreme Court has observed, we must " 'presume the jury followed these instructions.' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 30.) By contrast, in the case invoked by Vallejo, the jury was not instructed to consider aiding and abetting and therefore that theory was not before the jury. (See *People v. Kunkin* (1973) 9 Cal.3d 245, 250-251 ["We note at the outset, however, that the jury in this case was instructed on the elements of theft by larceny only," and "[w]e, of course, cannot look to legal theories not before the jury in seeking to reconcile a jury verdict with the substantial evidence rule."].)

Accordingly, we conclude that there was substantial evidence that Vallejo aided and abetted the murder of, and assault on, Navarro. Moreover, because there was substantial evidence of aiding and abetting, Vallejo's conviction for these offenses may be upheld without considering whether there was sufficient evidence that he directly committed those crimes.

### 3. The Knife Use Enhancements

However, we must decide whether Vallejo personally stabbed Navarro because, in convicting Vallejo of the murder and assault of Navarro, the jury found true the sentencing enhancement for personally using a knife under Penal Code section 12022, subdivision (b)(1). Vallejo once again contends that the VTA video conclusively shows that he could not have stabbed Navarro, and, here again, we disagree. While the VTA video does not show Vallejo stabbing Navarro, it shows that he had an opportunity, albeit brief, to do so. Nonetheless, we conclude that the record lacked sufficient evidence that Vallejo personally used a knife because it shows only a possibility that he did so.

13

Under Penal Code section 12022, subdivision (b)(1), "[a] person who personally uses a deadly or dangerous weapon in the commission of a felony shall be punished by an additional and consecutive term of imprisonment . . . for one year, unless use of a deadly or dangerous weapon is an element of that offense." Penal Code section 12022, subdivision (b)'s use requirement " 'requires something more than merely being armed' " and having the " 'bare potential for use.' " (*People v. Bland* (1995) 10 Cal.4th 991, 997.) While " 'there need not be conduct which actually produces harm,' " there must be "conduct which produces a fear of harm or force by means or display of a [weapon]." (*Ibid.*) In particular, Penal Code section 12022, subdivision (b) is satisfied if a deadly or dangerous weapon was "intentionally displayed in a menacing manner." (*People v. Wims* (1995) 10 Cal.4th 293, 302 (*Wims*), overruled on other grounds as stated in *People v. Sengpadychith* (2001) 26 Cal.4th 316, 325.)

Vallejo contends that the VTA video "unequivocally show[s] that Vallejo could not possibly have stabbed Navarro." According to Vallejo, the video shows that the confrontation between Trevino and Navarro "was well beyond [Vallejo's] reach," that "Trevino's body stood squarely between Vallejo and Navarro," and that during the period in which Vallejo stepped forward, he made no movement suggesting a stabbing attempt. In addition, Vallejo asserts, if he had stabbed Navarro, "his actions would have been noticeable on the video. . . ."

Having carefully scrutinized the videos, we are not persuaded. During the confrontation between Trevino and Navarro, Vallejo stands behind Trevino for approximately a second. However, he then moves to Trevino's right, partially obscured by a hanging plant, towards Navarro's left or back. Moreover, during the two seconds or so that Vallejo is obscured by the hanging plant, it is unclear where he is or how close he is to Navarro. As a consequence, there was enough time for Vallejo to approach Navarro and stab him. In addition, as neither Vallejo nor Navarro are clearly visible during this

14

time period, there is no reason to believe that such a stabbing would have been noticeable on the videos. Indeed, it is not even clear from the videos that any particular individual stabbed Navarro. Thus, the videos do not "completely and clearly contradict" the possibility that Vallejo stabbed Navarro. (*Morton*, *supra*, 707 F.3d at p. 1284.)

Vallejo contends that it "defies credulity to believe that Vallejo managed to commit a stabbing in the midst of a large crowd" without a single witness seeing it. Here again, we are not persuaded. As the Attorney General points out, Navarro was stabbed in the midst of a sudden and fast-moving brawl. Indeed, although four witnesses implicated Trevino in stabbing Navarro, three did not see anyone stab Navarro. And the fourth was dealing with the crowd and trying to contact additional security. It does not defy credulity that this last person failed to see someone circle behind Navarro and stab him.

Vallejo also contends that the witnesses testified that Trevino stabbed Navarro more than enough times to account for all of his wounds. That is true. One witness testified that Navarro was struck with five to six blows, and the forensic pathologist found five knife wounds. However, the witness who testified that Trevino stabbed Navarro did not see that Navarro was stabbed by the blows. As a consequence, there is no reason to assume that all the blows caused stab wounds.

Thus, none of the evidence cited by Vallejo prevented the jury from finding that Vallejo circled around Navarro and stabbed him in the back. To the contrary, because Vallejo disappears from the VTA video for two seconds or so after circling around, the evidence shows that Vallejo had an opportunity, albeit brief, in which to stab Navarro.

Other evidence also suggests that Vallejo might have stabbed Navarro. The pathologist who conducted the autopsy on Navarro could not say that only one knife was used to stab Navarro. In addition, the location of the wounds suggests that Trevino may not have been the only person to stab Navarro. The pathologist found that Navarro had five stab wounds. Three were to his left side, one from his neck downward to the chest

15

and two from his back upward toward the chest. However, the other two wounds were to Navarro's right side from the back downward. As Trevino had a knife in his right hand, it would have been difficult to stab Navarro in the right back if he was facing Navarro, which suggests that someone else may have stabbed Navarro in the right side.

Other evidence suggests that Vallejo may have been the other person who stabbed Navarro. First, the surveillance videos show Vallejo reaching into his pants pocket before running around Trevino towards Navarro and, after returning, holding his hands out in front of him as if folding a pocketknife. Second, there was a blood stain found on the seat belt of Ruiz's car where Vallejo was seated when police stopped the car. DNA testing resulted in "moderate-strong support" that Navarro was a minor contributor to the stain. Third, when the car was stopped by police, Vallejo fled from police and tried to discard his shirt.

However, the evidence is weak and inconclusive. While the forensic pathologist was unable to say that only one knife was used to stab Navarro, he was equally unable to say that there were two knives. Similarly, while the video evidence shows that Vallejo might have had a pocketknife, no knife was recovered by the police who apprehended him. And while Vallejo may have been able to circle around and stab Navarro in the back in the few seconds that he was hidden from the VTA video, there is no evidence in the record that he actually did so or even that there was enough room between Trevino and the wall of the building to permit him to do so. In addition, while some of blood that may have been from Navarro was found in the front passenger seat of Ruiz's car, no blood was found on Vallejo's hands or his shirt, where one would have expected to find blood had Vallejo stabbed Navarro. Finally, not much can be discerned from Vallejo's decision to flee from the police and discard his shirt because the shirt had blood on it—but not Navarro's—and because individuals flee from the police for many reasons, such flight may have limited probative value. (See *People v. Rubio* (2019) 43 Cal.App.5th 342, 353

16

[" 'uneven policing may reasonably affect the reaction of certain individuals—including those who are innocent—to law enforcement' "], quoting *United States v. Brown* (9th Cir. 2019) 925 F.3d 1150, 1156.)

Consequently, while the evidence shows a possibility that Navarro was stabbed by more than one person, a possibility that Vallejo had a knife, a possibility that Vallejo had the opportunity to stab Navarro, and a possibility that blood in Ruiz's car came from the stabbing, this evidence is too uncertain to allow a reasonable jury to conclude beyond a reasonable doubt that Vallejo in fact stabbed Navarro. (See *People v. Davis* (2013) 57 Cal.4th 353, 360 [" '[A] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference draw from evidence rather than. . . a mere speculation as to probabilities without evidence." ' "].)

The Attorney General notes that, even if Vallejo did not stab Navarro, the jury could have found the knife enhancement true if it found that he possessed a knife and menacingly displayed it. While that is correct (see *Wims*, *supra*, 10 Cal.4th at p. 302), the Attorney General does not point to any evidence Vallejo displayed a knife menacingly. None of the videos show that he menacingly displayed a knife, and we are not aware of any witness who testified that he did so. Indeed, the only evidence that he possessed a knife are the fleeting images of him reaching into his pocket before running around Navarro and later holding his hands out as if he were folding a pocketknife. Based on this record, no reasonable jury could find beyond a reasonable doubt that Vallejo menacingly displayed a knife.

Accordingly, we conclude the sentencing enhancements under Penal Code section 12022, subdivision (b)(1) for displaying a dangerous or deadly weapon should be vacated, and Vallejo resentenced. (See *People v. Garcia* (2020) 46 Cal.App.5th 123, 182-183.)

## B. Trial of Gang-Related Issues

Both Vallejo and Esquivel object that the gang participation charge and gang sentencing enhancements were tried with the non-gang charges and allegations, and they also object to the volume of gang-related evidence presented at trial. In particular, they argue that the trial court abused its discretion in refusing to sever the gang-participation charge and gang sentencing enhancements and to try those matters in a separate trial before a separate jury. In addition, while the trial in this case was conducted in 2021 several months before Penal Code section 1109 became effective and made bifurcation of gang enhancements automatic (Stats. 2021, ch. 699, § 5, enacting Pen. Code, § 1109, subd. (a); see also *People v. Burgos* (2024) 16 Cal.5th 1, 9, 31 (*Burgos*) [noting Penal Code section 1109 became effective in January 2022 and holding that it does not apply retroactively]), Vallejo and Esquivel contend that the gang participation charge and gang sentencing enhancement should have been severed and tried only after the non-gang matters. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1050 (*Hernandez*) [discussing the differences between severance and bifurcation].) In addition, both defendants contend that the gang-related evidence presented at trial was impermissibly cumulative under Evidence Code section 352. These objections are substantial, particularly with respect to the enormous volume of gang-related evidence presented. However, we need not determine whether the trial court abused its discretion in refusing to sever or bifurcate, or in admitting gang-related evidence, because, in light of the jury's finding the gang enhancements untrue and failing to convict on the gang participation charge, Vallejo and Esquivel were not prejudiced by any such abuse.

Under article VI, section 13 of the California Constitution, a judgment may be set aside for improper admission of evidence only if the admission "resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Accordingly, to overturn a conviction for failure to sever charges, "a defendant must make a clear showing of prejudice." (*People v.*

18

*Mendoza* (2000) 24 Cal.4th 130, 160, superseded by statute on other grounds as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 62-63.) Similarly, to overturn a conviction for failure to bifurcate or improper admission of evidence, a defendant must demonstrate prejudice. (See, e.g., *People v. Arias* (1996) 13 Cal.4th 92, 157 [admission of evidence]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1131 (*Ramos*) [bifurcation], disapproved on other grounds in *Burgos*, *supra*, 16 Cal.5th at p. 31.) To demonstrate prejudice, an appellant must show that it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Jandres* (2014) 226 Cal.App.4th 340, 360 [" ' "[A] 'probability' in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility*." ' "].)

In large part due to their success at trial, Vallejo and Esquivel have failed to demonstrate prejudice. In connection with all the charges except for gang participation, the indictment alleged that the charged offenses were committed "for the benefit of, at the direction of, and in association with a criminal street gang" under Penal Code section 186.22, subdivision (b)(4). However, in connection with each of defendants' convictions, the jury found these allegations not true. In addition, the jury failed to reach a verdict on the gang participation charges against Vallejo and Esquivel. Thus, far from being overborn by the gang-related charges and allegations or overwhelmed by the enormous amount of gang-related evidence presented by the prosecution, the jury declined to convict on the gang participation charge and outright rejected the allegation that Vallejo and Esquivel acted to benefit a gang.

In addition, the gang-related charges, allegations, and evidence did not inflame the jury into convicting Vallejo and Esquivel of all the charges against them. To the contrary, as just noted, the jury declined to reach a verdict on the gang-related charge. In addition, the jury acquitted Vallejo and Esquivel of two charges, first degree murder and one count

19

of assault with a deadly weapon, and it failed to reach a verdict on a third, attempted robbery. Far from suggesting that the jury was overwhelmed and improperly swayed, these mixed verdicts indicate that the jury made careful and balanced determinations uninfluenced by the gang-related charges, allegations, and evidence presented by the prosecution. Indeed, "that defendant was acquitted of *any* of the offenses suggests the lack of prejudice and the jury's clear ability to consider each count on the evidence presented and nothing else." (*People v. Mendibles* (1988) 199 Cal.App.3d 1277, 1312, overruled on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12; see also *Ramos*, *supra*, 77 Cal.App.5th at pp. 1131-1132 ["Any inference of prejudice resulting from the gang evidence is dispelled by the fact that the jury acquitted all the defendants of attempted murder and could not reach a verdict on the attempted voluntary manslaughter charges."].)

Nor do Vallejo and Esquivel persuasively argue otherwise. Both assert that the evidence underlying their convictions was weak and that there is a reasonable probability that they would have been acquitted of murder if trial had been bifurcated. However, they fail to offer persuasive support for these assertions. In particular, they fail to explain why, if the jury rejected the gang allegations, acquitted on two counts, and refused to convict on the gang-related charge in the face of the gang-related charges, allegations, and evidence, it is reasonably probable that, in their absence, the jury would have rendered more favorable verdicts.

We therefore conclude that Vallejo and Esquivel have failed to show a reasonable probability that the jury would have reached a more favorable verdict absent the gang-related charges, allegations, and evidence. Accordingly, even if the trial court abused its discretion in refusing to sever the gang-related charge, to bifurcate trial of the gang-related sentencing enhancements, or to exclude cumulative gang-related evidence, defendants were not prejudiced, and there was no reversible error.

20

## C. The Racial Justice Act

The final gang-related argument of Vallejo and Esquivel is under the California Racial Justice Act of 2020 (RJA) (Stats. 2020, ch. 317, § 3.5, codified in Pen. Code, § 745). Defendants contend that the gang participation charge and gang sentencing enhancements violated the RJA by tainting their trial with racially charged and biased evidence, and that their trial counsel rendered ineffective assistance by failing to object under the statute.

Gang charges and enhancements implicate the same general problem of racial bias and unfair prejudice that the RJA addresses. Indeed, in enacting Penal Code section 1109 and requiring bifurcation of gang enhancement allegations, the Legislature found that gang enhancements "disproportionately impact[] communities of color" and the evidence presented in connection with such enhancements "perpetuates unfair prejudice in juries." (Stats. 2021, ch. 699, § 2, subd. (d)(6); see also *id*., § 5 [enacting Pen. Code, § 1109].) However, the RJA, which was enacted a year before section 1109 (Stats. 2020, ch. 317, § 3.5), does not directly address either gang enhancements or bifurcation, and in the trial court defendants did not argue that the RJA required bifurcation of the gang charges and enhancements.

As explained below, because defendants' failure to object to bifurcation based on the RJA deprived the trial court of the opportunity to cure any violation of the statute, we conclude that defendants forfeited their RJA objection concerning bifurcation. We also conclude that, on the appellate record, defendants have not shown ineffective assistance of counsel based on failure to argue that RJA prohibited bifurcation.

### 1. *Statutory Background*

The RJA's " 'stated aim' " is " ' "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or

obtaining convictions or in sentencing." ' " (*People v. Wagstaff* (2025) 111 Cal.App.5th 1207, 1216, review den. Oct. 15, 2025, S292031 (*Wagstaff*).)

Penal Code section 745 added the RJA, which provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (Pen. Code, § 745, subd. (a).) A violation of this prohibition is shown by proving one of four types of conduct: (1) A judge, attorney, or law enforcement officer involved in a case "exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin"; (2) during trial, the judge, an attorney, a law enforcement officer, expert witness, or juror "used racially discriminatory language" or "otherwise exhibited bias or animus" against the defendant's race, ethnicity, or national origin; (3) the defendant was "charged or convicted of a more serious offense" than similarly situated defendants of a different race, ethnicity, or national origin, and "the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses" against people of the defendant's race, ethnicity, or national origin; and (4) "[a] longer or more severe sentence was imposed on the defendant than . . . similarly situated individuals" and "longer or more severe sentences" were imposed more frequently on people of the defendant's race, ethnicity, or national origin in the county. (*Id.*, subd. (a)(1)-(4).)

The RJA also provides remedies. If a violation is found before entry of judgment, the trial court shall grant a mistrial; empanel a new jury; dismiss enhancements, special circumstances, and special allegations, or reduce one or more charges; or provide another remedy not prohibited by another law. (Penal Code, § 745, subd. (e)(1).) If a violation is found after entry of judgment, the trial court shall "vacate the conviction and sentence, find that it is legally invalid, and order new proceedings" consistent with the statute's requirements. (*Id*., subd. (e)(2).)

## 2. *Forfeiture*

In the trial court, defendants' counsel did not invoke the RJA. Esquivel notes that, in requesting bifurcation, his trial counsel argued that gang evidence would have a racially discriminatory impact. However, in so doing, counsel invoked the legislative findings in Assembly Bill No. 333 (2021-2022 Reg. Sess.), the legislation enacting Penal Code section 1109, not the RJA. Absent a reference to the RJA, the trial court had no reason to consider whether the statute required bifurcation and therefore no opportunity to avoid the violation of the statute asserted by defendants.

"There is no provision in section 745 for raising a violation of the statute for the first time on direct appeal." (*People v. Simmons* (2023) 96 Cal.App.5th 323, 336 (*Simmons*). Accordingly, Court of Appeal decisions have held that failure to invoke the RJA in the trial court forfeits any claim under the statute on appeal. (See *Wagstaff*, *supra*, 111 Cal.App.5th at p. 1216, review den.; *People v. Lashon* (2024) 98 Cal.App.5th 804, 811-812; *Simmons*, at p. 336; see also *People v. Lawson* (2025) 108 Cal.App.5th 990, 1000-1001 ["Asking a trial court to consider whether its proposed ruling reflects the court's own implicit biases, or could have the unintended consequence of playing to jurors' implicit biases, serves an important purpose in raising the court's consciousness of the biases the Racial Justice Act is intended to eliminate."].) Justice Evans, joined by Justice Liu, has disagreed, arguing that the forfeiture doctrine does not apply to the RJA at least where a judge has been accused of bias because of the public interest in racial bias in the judicial system. (*Wagstaff*, *supra*, 111 Cal.App.5th 1207, review den. [stmt. of Evans, J.].) However, the remaining Supreme Court justices have not adopted this position, and the RJA violation asserted in this case does not so directly implicate the integrity of the judicial system. Accordingly, we follow prior Court of Appeal decisions holding that in appropriate cases RJA challenges may be forfeited.

23

Esquivel argues that it would have been futile to invoke the RJA in light of the trial court's rejection of his argument that allowing the state to present gang evidence would have a racially discriminatory effect. We are not persuaded. Esquivel's argument was made in connection with Vallejo's request for bifurcation of the gang enhancement, a matter over which at that time trial courts had broad discretion. (See *Hernandez*, *supra*, 33 Cal.4th at p. 1050.) The RJA does not grant such discretion; to the contrary, it requires trial courts to find violations upon proof of specified conduct and requires that such violations be remedied. (See Pen. Code, § 745, subd. (a); *id*., § 745, subd. (e)(1), (2).) Defendants had no reason to expect, based on the trial court's exercise of discretion over bifurcation, that the court would fail to apply the RJA's mandatory provisions.

Noting that the RJA expressly refers to waiver but not forfeiture (Pen. Code, § 745, subd. (c)), in his reply brief Esquivel contends that there is no forfeiture under the RJA. Because this argument was not raised in Esquivel's opening brief, we need not entertain it. (See, e.g., *People v. Tully* (2012) 54 Cal.4th 952, 1075 ["It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party."].) In any event, the argument is unpersuasive. While the RJA states that "[a] motion that is not timely filed may be deemed waived, in the discretion of the court" (Pen. Code, § 745, subd. (c)), nothing in the RJA suggests that defendants who fail to invoke the statute in the trial court are free to do so on appeal.

Accordingly, we conclude that defendants forfeited any RJA claim by failing to raise it in the trial court

### 3. *Ineffective Assistance*

Vallejo and Esquivel argue that if their trial counsel forfeited a claim under the RJA by not raising it in the trial court, then counsel rendered ineffective assistance of counsel. Here again, we disagree.

24

a. <u>Relevant Legal Principles</u>

To demonstrate ineffective assistance of counsel, a defendant must establish two things: (1) counsel's performance was deficient and (2) this deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).) A counsel's performance is deficient if it "fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) However, judicial review of counsel's performance is "highly deferential," and courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id.* at p. 689; see *People v. Weaver* (2001) 26 Cal.4th 876, 925 [" 'there is a "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance" ' "].)

A defendant's burden with respect to ineffective assistance of counsel is especially " 'difficult to carry on direct appeal.' " (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) Absent these circumstances, ineffective assistance of counsel claims are "more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

b. <u>Application</u>

Vallejo and Esquivel have not shown ineffective assistance. Under prevailing professional norms, defense counsel may refrain from raising objections that appear meritless. (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections."].) However, Vallejo and Esquivel fail to explain how any of the four types of conduct proving a violation of the RJA is present here. Vallejo and Esquivel do not even mention two of the categories: that the offenses with which they

were charged or convicted were more severe than those sought or imposed on similarly situated individuals of a different race, ethnicity or national origin (Pen. Code, § 745, subd. (a)(3)) or that the sentence imposed was longer or more severe than those imposed on such individuals (*id*., subd. (a)(4)). Vallejo does mention the remaining two categories: "us[ing] racially discriminatory language" (*id.*, subd. (a)(2)) or "exhibit[ing] bias or animus" (*id.*, subd. (a)(1)). However, he does not point to any such language or bias. Instead, Vallejo and Esquivel assert that the gang sentencing enhancements created racially discriminatory effects without explaining how those effects fit within any of the categories of conduct that the RJA identifies as violating it. Defendants' trial counsel did not fall outside "the wide range of reasonable professional assistance" (*Strickland*, *supra*, 466 U.S. at p. 689) by not asserting a violation of the RJA without any apparent articulable basis in the text of the statute.

### D. The Implied Malice Instruction

In addition to the gang-related challenges, Vallejo and Esquivel contend that the trial court erroneously instructed the jury on implied malice murder. Although the trial court used then-applicable CALCRIM instructions, Vallejo and Esquivel contend that the instructions were erroneous under the Supreme Court's recent decision in *People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*). Reviewing the jury instructions de novo (*People v. Posey* (2004) 32 Cal.4th 193, 218), we conclude that the instructions were correct.

Defendants' objection to the instructions concerns the objective or physical component of implied malice murder, which the Supreme Court has described in two ways. First, under the *Thomas* test formulated by Justice Traynor, the physical component of implied malice murder has been described as " 'an act that involves a high degree of probability that it will result in death.' " (*People v. Knoller* (2007) 41 Cal.4th 139, 153 (*Knoller*), quoting *People v. Thomas* (1953) 41 Cal.2d 470, 480 (conc. opn. of Traynor, J.).) Second, under the *Phillips* test developed a decade later, the physical

component of implied malice murder has been described as " ' "an act, the natural consequences of which are dangerous to life." ' " (*Id*. at p. 152, quoting *People v. Phillips* (1966) 64 Cal.2d 574, 587, overruled on another ground in *People v. Flood* (1998) 18 Cal.4tth 470, 490, fn. 12.) The Supreme Court has long held that "these two definitions of implied malice in essence articulated the same standard." (*Ibid*.; see *In re Ferrell* (2023) 14 Cal.5th 593, 600; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 103-104; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1218-1219 (*Dellinger*); *People v. Watson* (1981) 30 Cal.3d 290, 300.) Accordingly, the Supreme Court approved an instruction stating that malice is implied " 'when the killing results from an intentional act, the natural consequences of which are dangerous to life.' " (*Dellinger*, *supra*, 49 Cal.3d at p. 1217, quoting the 1983 version of CALJIC No. 811]; see also *id*. at p. 1221 ["It was not error to instruct the jury below in the language of the 1983 revision of CALJIC Nos. 8.11 or 8.31."].)

Here, the trial court instructed the jury on the *Phillips* test. Using CALCRIM No. 520, the court instructed that implied malice murder requires the defendant to intentionally commit an act and "[t]he natural and probable consequences of the act were dangerous to human life." Similarly, the trial court instructed the jury that a defendant is guilty of aiding and abetting an implied malice murder if, among other things, "[t]he perpetrator committed an act, the natural and probable consequences of which were dangerous to human life."

As Vallejo and Esquivel note, in *Reyes*, *supra*, 14 Cal.5th 981, the California Supreme Court applied the *Thomas* rather than the *Phillips* test in determining that the evidence presented was insufficient to support a conviction for implied malice murder. (*Reyes*, *supra*, 14 Cal.5th at p. 989.) However, in so doing, *Reyes* did not cast any doubt on the continuing validity of the *Phillips* test. To the contrary, citing its earlier opinion in *Knoller*, *supra*, 41 Cal.4th 139, the Supreme Court in *Reyes* reiterated that "under the

27

objective component of implied malice, ' " 'dangerous to life' " ' *means the same thing as* a ' "high degree of probability that" ' the act in question ' "will result in death." ' " (*Reyes*, at p. 989, italics added.)

Esquivel and Vallejo point out that the Judicial Council revised the CALCRIM instruction for implied malice murder after the *Reyes* decision to specify that "[a]n act is dangerous to human life if there is a high degree of probability that the act will result in death." (CALCRIM No. 526 (2023 Supp.), italics omitted.) However, " 'jury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent.' " (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1157, fn. 7.) Moreover, the Judicial Council's decision to clarify the instruction for implied malice murder using the *Thomas* test does not suggest that its previous instruction using the *Phillips* test was erroneous. It simply means that the Judicial Council decided that it is better to ask juries to apply the *Thomas* test. Accordingly, "the instruction under the former version of CALCRIM No. 520 remains a correct statement of law," notwithstanding the change in the instruction. (*People v. Pierce* (2025) 114 Cal.App.5th 508, 536.)

We therefore conclude that the trial court properly instructed the jury on the objective component of implied malice murder.

### E. Cumulative Error

Finally, Vallejo and Esquivel contend that cumulative error warrants reversal. However, we have concluded there was no prejudice from trying the gang charge and enhancements together with the substantive charges, and none from admitting any of the gang evidence. And we have found no error in any other claim. Accordingly, "there is no prejudice to cumulate." (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 391.)

28

### III. DISPOSITION

The judgment against Esquivel in Case No. H050184 is affirmed. The judgment against Vallejo in Case No. H050184 is reversed, Vallejo's sentence is vacated, and the matter is remanded to the trial court with instructions to strike the sentencing enhancements under Penal Code section 12022, subdivision (b)(1) for personally using a knife and to resentence Vallejo. Vallejo's convictions in Case No. H050184 are otherwise affirmed.

_____

BROMBERG, J.

WE CONCUR:

_____

GREENWOOD, P. J.

_____

DANNER, J.

*People v. Vallejo et al.*
H050184